THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: August 8, 2012                    Mailed: March 13, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*The Board of Regents, The University of Texas System*

*v.*

*Southern Illinois Miners, LLC*

———

Opposition No. 91183196
Opposition No. 91183698[1]

———

Louis T. Pirkey and, William G. Barber of Pirkey Barber LLP for Board of Regents, The University of Texas System.

Paul A. Lesko, Jo Anna Pollock and Stephen C. Smith of Simmons Browder Gianaris Angelides & Barnerd LLC for Southern Illinois Miners, L.L.C.

———

Before Bucher, Lykos and Greenbaum, Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

Southern Illinois Miners, LLC ("applicant") filed applications to register the standard character mark **MINERS** as well as the special form mark shown at right:



---

[1] The Board consolidated the oppositions on May 19, 2008. Accordingly, this decision addresses both oppositions.

In each application, the identified goods and services are as follows:

> books in the field of professional baseball; brochures about professional baseball; bulletins concerning professional baseball; charts in the field of professional baseball; informational letters concerning professional baseball; newsletters in the field of professional baseball; printed calendars; printed charts; printed emblems; printed guides in the field of professional baseball for media use; printed informational cards in the field of professional baseball; printed materials, namely, press releases featuring information on topics related to professional baseball; printed paper signs; printed products, namely, professional baseball trading cards, professional baseball game programs, bumper stickers, calendars, paper coasters, decals, desk calendars, pennants and scorecards; pencils; pens; printed tickets; prints in the nature of professional sports photographs; souvenir programs concerning professional baseball in International Class 16;
>
> professional baseball imprinted clothing, namely, athletic uniforms, golf shirts, headgear, namely, hats, caps, visors, infant and toddler one piece clothing, jerseys, knit shirts, ponchos, short-sleeved or long-sleeved t-shirts, short-sleeved shirts, sweat shirts, t-shirts, wind shirts in International Class 25; and
>
> entertainment in the nature of professional baseball games in International Class 41.[2]

The Board of Regents, The University of Texas System ("opposer") opposes registration of each mark, in International Classes 16 and 25 only, under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's marks, when applied to applicant's goods, so resemble opposer's previously used and registered standard character word mark MINERS and the two design marks

---

[2] Application Serial Nos. 77034407 and 77043344, filed on November 1, 2006, and November 14, 2006, respectively, on the basis of applicant's *bona fide* intention to use the marks in commerce, under Trademark Act § 1(b), 15 U.S.C. § 1051(b). The latter application includes a disclaimer of the words SOUTHERN ILLINOIS and the following description of the mark: "the mark consists of a stylized coal miner holding a baseball bat."

shown below as to be likely to cause confusion, mistake or deception. Opposer also alleges that applicant's marks so resemble opposer's marks as to dilute the distinctive quality of opposer's marks.[3] Opposer's pleaded marks[4] are as follows:

| Mark | Goods and Services |
|---|---|
| **MINERS** | for "entertainment services – namely, sponsoring and conducting college athletic exhibitions and competitions" in International Class 41;[5] |
| **MINERS** | for "printed programs for college sporting events and media guides" in International Class 16;[6] |
| **MINERS** | for "college imprinted clothing, namely, shirts, hats and baby shirts" in International Class 25;[7] |
| **MINERS** | for "miniature basketballs" in International Class 28;[8] |
| | for "clothing, namely shirts, hats, baby shirts and baby pants" in International Class 25;<br>"educational services, namely providing college and graduate level courses of instruction, continuing education courses and seminars, and opportunities for students to participate in research programs; entertainment services, namely college sport games and events rendered live and through the media of radio |

---

[3] The April 15, 2010 Board order, which denied applicant's motion for summary judgment, found that opposer's dilution claim was insufficiently pleaded. Opposer promptly filed a motion for leave to file an amended notice of opposition to correct the deficient dilution claim, and has pursued the claim in its brief. The Board granted this motion as conceded on July 20, 2010.

[4] Opposer also pleaded two registrations in International Classes 16 and 25 for a caricature of a running miner, wearing a UTEP shirt and holding a pickaxe, but the registrations were cancelled during the pendency of this proceeding for failure to file an acceptable declaration under Section 8.

[5] Registration No. 1228753, claiming first use anywhere and use in commerce since at least as early as 1914, issued on February 22, 1983; second renewal.

[6] Registration No. 1590813, claiming first use anywhere at least as early as 1950, and use in commerce since at least as early as 1984, issued on April 10, 1990; renewed. This registration includes a claim of acquired distinctiveness under Section 2(f) of the Trademark Act.

[7] Registration No. 1590965, claiming first use anywhere and use in commerce since at least as early as June 1984, issued on April 10, 1990; renewed.

[8] Registration No. 1591100, issued on April 10, 1990, alleging April 1986 as the date of first use anywhere and use in commerce; renewed.

| Mark | Goods and Services |
|---|---|
|  | and television, musical concerts and entertainment, and performances of dramatic works" in International Class 41;[9] and |
| | for "shirts, jackets, warm-up suits, sweat shirts, sweat pants, caps, bandanas, shorts, scarves, ponchos, raincoats, tank tops, sweat bands, cloth baby bibs, baby panties and dresses, wrist bands, belts, socks, wind suits" in International Class 25.[10] |

Applicant denied the salient allegations of the notices of opposition in its answers, and raised two "affirmative defenses" that it did not pursue in its amended answers and counterclaim. Prior to the opening of opposer's testimony period, applicant moved to amend its answers to assert a counterclaim to partially cancel five of opposer's six pleaded registrations because opposer purportedly abandoned the word and design marks for collegiate baseball, and because opposer purportedly only uses its word and design marks in connection with collegiate-related goods.[11] Applicant also alleged that likelihood of confusion would be avoided if opposer's registrations were limited accordingly. The December 25, 2010 Board order granted the motion, and construed the counterclaims as seeking partial cancellation under Section 18 in the nature of restricting the goods and services identified in opposer's registrations. 15 U.S.C. § 1068; Trademark Rule 2.133(b), 37 C.F.R. § 2.133(b). The parties briefed the counterclaim as a Section 18 restriction, and at oral hearing, opposer expressly consented to trying the counterclaim in that manner. In view

---

[9] Registration No. 2992329, issued on September 6, 2005, alleging August 1999 at the date of first use anywhere and in commerce; Section 8 and 15 affidavits accepted and acknowledged.

[10] Registration No. 3397296, issued on March 18, 2008, alleging August 2004 as the date of first use anywhere and in commerce.

[11] There is no counterclaim against Registration No. 1590965, which already includes the designation "college imprinted" in the identification of goods.

thereof, we consider the pleadings to be amended accordingly.[12] *See* Fed. R. Civ. P. 15(b)(2). Opposer, in its answers, denied the salient allegations of the counterclaim.

The case has been fully briefed. For the reasons discussed below, we sustain the opposition and deny the counterclaims.

## Evidentiary Objections

The evidentiary record in this case is relatively large, and each party has interposed evidentiary objections. Many of the parties' objections relate to admissibility (e.g., hearsay, "late-produced" documents), while others relate to relevance and probative value (e.g., witness bias). To the extent we have relied on specific material against which applicant has lodged an objection, we explain our reasoning below. We see no need to discuss the other objections separately, as none of them is outcome determinative. Rather, we have considered the entire record in making our decision, keeping in mind the parties' various objections, and have accorded whatever probative value the subject testimony and evidence merit.

## The Record

The record consists of the pleadings; the files of the involved applications and the five registered marks subject to the counterclaim; trial testimony, with accompanying exhibits, taken by each party; opposer's notices of reliance introducing status and title copies of the six pleaded registrations and seven additional registrations of the pickaxe design, third party registrations and file histories, applicant's responses to opposer's interrogatories and requests for

---

[12] The counterclaim of abandonment was not pursued at trial, and we will give it no further consideration.

admission, a portion of the discovery deposition of applicant's expert witness, documents submitted pursuant to the Joint Stipulation of the parties approved by the Board on July 31, 2011,[13] including a copy of a photograph of a shirt produced in response to opposer's document request, copies of Internet printouts, and excerpts of printed publications; and applicant's notice of reliance introducing copies of third party registrations, copies of the file histories of two of opposer's pleaded registrations for the word mark MINERS and opposer's pending application for the MINERS word mark, and an article from a printed publication. In addition, as defendant in the counterclaim, opposer introduced trial testimony with accompanying exhibits, and copies of Internet printouts. Both parties filed briefs, and both were represented by counsel at an oral hearing held before this panel.

<u>The Parties</u>

Opposer is The Board of Regents, The University of Texas System, which governs Texas state universities including the University of Texas at El Paso ("UTEP"). The school now known as UTEP was established as Texas' first school of mines approximately 100 years ago, and has operated continuously ever since. MINERS has long been the school's nickname and the name of its sports teams. In addition, the miner and pickaxe designs depicted in the marks above are viewed as

---

[13] The Board notes with approval the parties' stipulation regarding expert testimony. While this case was not tried in accordance with the Board's Accelerated Case Resolution procedure (ACR), the parties nonetheless availed themselves of these ACR-type efficiencies.

 Additional information regarding ACR is available in TBMP §§ 528.05(a)(2), 702.04 and 705 (3d ed. Rev. 2 2013), and on the Trademark Trial and Appeal Board web page of the United States Patent and Trademark Office (USPTO) website at www.uspto.gov.

school symbols and have been associated with the school and its sports teams.[14] UTEP currently has more than 20,000 enrolled students, 80,000 alumni, and a $265 million operating budget.

As an NCAA Division I school within Conference USA, UTEP currently plays 16 sports under the MINERS word and design marks, excluding baseball.[15] UTEP plays conference games in the Conference USA region, which, at the time of trial, comprised nine states in the central and eastern United States, and non-conference games, including bowl games and other post-season games, across the United States. Many of UTEP's sports events are played and broadcast nationwide. UTEP MINERS football teams recently played in two bowl games, and the 1966 MINERS basketball team,[16] which was the first team to win the NCAA Men's Division I Basketball Tournament with an all-African American starting lineup, was inducted into the Basketball Hall of Fame in 2007. The 2006 Walt Disney movie "Glory Road" tells the story of the 1966 MINERS basketball team.

Opposer, through the Collegiate Licensing Company ("CLC"), licenses the MINERS word and design marks to approximately 160 licensees located throughout the United States for use on clothing and other merchandise. In addition, as a result of prior Board litigation concerning the four MINERS word mark registrations opposer pleads herein, opposer has a license agreement with Missouri S&T, formerly the University of Missouri at Rolla ("Rolla License"). The Rolla

---

[14] Although opposer pleaded rights to other common law marks incorporating images of miners and their tools, the record is undeveloped as to these marks.

[15] UTEP has not had a baseball team for more than 20 years.

[16] At the time, UTEP was known as Texas Western College.

License, which has been in effect since 1989, allows Missouri S&T to use the word mark MINERS for college educational and entertainment services, and to use and sublicense use of that mark for "college imprinted goods" in Illinois, Arkansas, Iowa, Kansas, Missouri, Nebraska and Oklahoma. The Missouri S&T baseball team operates under the MINERS mark licensed from opposer.

Applicant, a professional minor league baseball team from Marion, Illinois, was founded in 2006. In 2007, applicant began to play baseball in the independent Frontier League under the name MINERS. The Frontier League consists of teams from six Midwestern states, including Illinois and Missouri, which overlap with the Missouri S&T territory pursuant to the Rolla License. There is a long history of coal mining in southern Illinois, and, by all reports, the local residents and other fans of applicant identify with the MINERS name in a positive manner. Applicant's sales of clothing, programs and other products bearing the MINERS word and applied-for composite design mark have reached approximately $250,000 per year since 2006.

<u>Standing and Priority</u>

Applicant has not objected to or disputed opposer's standing to bring this opposition proceeding. Nonetheless, opposer must demonstrate its standing and prior use in order to prevail on its asserted Section 2(d) claim. Opposer has properly made of record its six pleaded registrations, and also has demonstrated its use of the MINERS word mark, the miner design mark and the pickaxe design mark. Opposer also is the owner of application Serial No. 77473822 for the standard character mark MINERS for various clothing items in International Class 25, against which applicant's standard character mark MINERS has been cited as a

8

potential bar to registration.[17] These facts are sufficient to demonstrate that opposer has a real interest in this proceeding and therefore has standing. *See Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

In view of opposer's ownership of valid and subsisting registrations of its standard character MINERS mark, miner design mark and pickaxe design mark, priority is not in issue with respect to the goods and services identified therein. *See King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Moreover, applicant does not contest opposer's priority.

## Likelihood of Confusion

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also, In re Majestic Distilling Co.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence.

For purposes of this analysis, we focus on opposer's registrations for the standard character mark MINERS in International Classes 16 and 25 because this mark is the closest to the applied-for marks, and the registrations cover goods that, when considered vis-à-vis the applied-for marks and the identified goods, are most

---

[17] Opposer filed this application after these opposition proceedings commenced. The application is suspended pending disposition of this proceeding. Applicant made the application file of record by notice of reliance.

likely to support a finding of likelihood of confusion. *See, e.g., In re Max Capital Group Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010).

1. <u>The Marks</u>

We begin by comparing the marks. We consider and compare the appearance, sound, connotation and commercial impression of the marks in their entireties. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted). *See San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.,* 972 F.2d 1353 (Fed. Cir. June 5, 1992). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975).

There is no question that the parties' standard character marks, MINERS, are identical.

With respect to applicant's composite mark shown at right, it is well-settled that one feature of a mark may be more significant than another, and it is not improper to give more  weight to a dominant feature in determining the commercial impression created by the mark. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.").

We find that the word MINERS is the dominant portion of the composite mark for the following reasons. First, the word MINERS is the most visually prominent portion of the composite mark, closely followed by a pictorial representation of a miner. In the case of marks consisting of words and a design, the words are normally given greater weight because they would be used by consumers to request the products. *In re Dakin's Miniatures, Inc.*, 59 USPQ2d 1593, 1596 (TTAB 1999); *In re Appetito Provisions Co.*, 2 USPQ2d 1553, 1554 (TTAB 1987). *See also Sweats Fashions Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987); *Giant Food, Inc. v. Nation's Food Service, Inc.*, 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983).

Second, it is well-settled that disclaimed, geographically descriptive matter, such as the wording SOUTHERN ILLINOIS, may have less significance in likelihood of confusion determinations. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000), *quoting National Data Corp.*, 224

USPQ at 752 (Fed. Cir. 1983) ("Regarding descriptive terms, this court has noted that the descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion."). Moreover, "SOUTHERN ILLINOIS" appears in much smaller letters than the word MINERS and is tiny compared to the rest of the mark.

Third, the design of "a stylized coal miner holding a baseball bat" reinforces the impression of the dominant literal element, MINERS. *See, e.g., Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) (the phrase CROSSWORD COMPANION is more dominant than the grid design element of the composite mark since the design only reinforced the connotation created by the phrase).

The dominant portion of applicant's composite mark is identical to the entirety of opposer's MINERS registered word marks. Likelihood of confusion is often found where the entirety of one mark is incorporated within another. *In re Denisi,* 225 USPQ 624, 626 (TTAB 1985) (PERRY'S PIZZA for restaurant services specializing in pizza and PERRY'S for restaurant and bar services); *Johnson Publishing Co. v. International Development Ltd.,* 221 USPQ 155, 156 (TTAB 1982) (EBONY for cosmetics and EBONY DRUM for hairdressing and conditioner); *In re South Bend Toy Manufacturing Company, Inc.,* 218 USPQ 479, 480 (TTAB 1983) (LIL' LADY BUGGY for toy doll carriages and LITTLE LADY for doll clothing). In focusing on the dominant portion of applicant's mark, we recognize, of course, that the marks ultimately must be compared in their entireties, including the additional wording SOUTHERN ILLINOIS and the miner design in applicant's mark. However, when

this comparison is made, we find that the marks are similar, albeit not identical, in sound, appearance and meaning. Because of the similarities between the marks in their entireties, the marks engender similar overall commercial impressions. *See, e.g., In re Computer Systems Center Inc.*, 5 USPQ2d 1378, 1381 (TTAB 1987) (holding CSC ADVANCED BUSINESS SYSTEMS for retail computer store services and computer maintenance and repair services in connection therewith, and CSC for various computer-related services, likely to cause confusion, noting that "the inclusion of 'ADVANCED BUSINESS SYSTEMS' as a feature of applicant's mark is not likely to help customers … distinguish the source of each party's service.").

Accordingly, the similarities between opposer's standard character MINERS mark, and applicant's standard character MINERS mark and composite mark SOUTHERN ILLINOIS MINERS and miner design, weigh in favor of a finding of likelihood of confusion.

    2.  <u>The Goods</u>

We next turn to consider the goods. Preliminarily, we note that the greater the degree of similarity between the marks, the lesser the degree of similarity between the goods is necessary to support a finding of likelihood of confusion. *In re Opus One, Inc.*, 60 USPQ2d 1812, 1815 (TTAB 2001); *In re Concordia Int'l Forwarding Corp.*, 222 USPQ 355, 356 (TTAB 1983). In addition, it is well-established that the goods or services of the parties need not be similar or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the goods or services of the parties are related in some manner, or that the conditions and activities surrounding the marketing of the goods or

services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. *See, e.g.*, *Coach*, 101 USPQ2d at 1722; *Hilson Research, Inc. v. Society for Human Resource Management*, 27 USPQ2d 1423 (TTAB 1993); *In re Int'l Telephone & Telegraph Corp.*, 197 USPQ 910, 911 (TTAB 1978). The issue, of course, is not whether purchasers would confuse the goods or services, but rather whether there is a likelihood of confusion as to the source thereof. *In re Rexel, Inc.*, 223 USPQ 830 (TTAB 1984); *see also J. C. Hall Co. v. Hallmark Cards, Inc.*, 340 F.2d 960, 144 USPQ 435, 438 (CCPA 1965) ("The confusion involved, of course, is not a confusion of goods but a confusion of business ….").

We make our determination regarding the similarities between the parties' goods based on the goods as they are identified in the applications and registrations, respectively. *Octocom Systems Inc. v. Houston Computers Services, Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Canadian Imperial Bank of Commerce v. Wells Fargo Bank, N.A.* 811 F.2d 1490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1992). In this case, opposer's Class 16 goods are identified as "printed programs for college sporting events and media guides," while applicant's Class 16 goods include "souvenir programs concerning professional baseball" and "printed guides in the field of professional baseball for media use." Opposer's Class 25 goods are identified as "college imprinted clothing, namely, shirts, hats and baby shirts," while applicant's Class 25 goods are identified as various articles of "professional baseball imprinted clothing" including "golf shirts, jerseys, knit shirts, short-sleeved or long-

sleeved t-shirts, short-sleeved shirts, sweat shirts, T-shirts, wind shirts," "headgear, namely, hats, caps, visors" and "infant and toddler one piece clothing."

As is readily apparent, both parties offer, under the identical MINERS mark, programs for athletics events and guides for media use in Class 16, and shirts, hats and baby clothes in Class 25. Applicant also offers these items under its highly similar composite mark, which features the word MINERS.

With regard to the parties' Class 16 goods, unlike the "printed programs," which opposer specifies are for "college sporting events," the broadly worded "media guides" listed in opposer's identification of Class 16 goods contain no such limitation. Even if we construed opposer's "media guides" to include "university media guides," there is nothing in the record clarifying how media guides for university sports teams and professional sports teams might be different. In any case, we find that opposer's "media guides" are closely related to applicant's "printed guides in the field of professional baseball for media use," and consider the items to be legally equivalent. In the context of likelihood of confusion, it is sufficient if likelihood of confusion is found with respect to use of the mark on *any* item that comes within the identification of goods in each class in an application or registration. *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1073 (TTAB 2011) ("Inasmuch as opposer has opposed all three classes of goods in the subject application, we address the similarity of goods for each class, keeping in mind that a likelihood of confusion may be found with respect

to a particular class based on any item within the identification of goods for that class.").

We now turn to the Class 25 goods. The crux of the matter is whether the term "college imprinted" in the registrations and the term "professional baseball imprinted" in the applications sufficiently differentiate the goods.[18] We take these terms simply to mean that opposer's goods will have at least one of opposer's marks printed directly on them, and that applicant's goods will have at least one of applicant's marks printed directly on them. As discussed below, because both parties imprint their marks, which include the identical MINERS mark (and applicant's highly similar composite mark, which features the word MINERS), on clothing, including identical articles of clothing, the prefatory terms "college imprinted" and "professional baseball imprinted" do not distinguish the goods.

Applicant's arguments that the "imprinted" language means something more are not persuasive. Applicant points to the CLC license, which requires apparel licensees to affix to the merchandise a hangtag or sticker with the words "Officially Licensed Collegiate Product" thereon, to support its argument that "college imprinted" means apparel bearing such a sticker or hangtag. However, the CLC

---

[18] The terms "college imprinted" and "professional baseball imprinted" were added by examiner's amendments during the prosecution of the parties' respective applications. Opposer's Class 25 application does not indicate the reason for the amendment, which was entered in 1987, and provides no information about the significance of the term. The term "college imprinted" also appears in the Rolla License agreement of 1989, but the term is undefined therein. Opp. Exh. 6 (to Westemeier Dep.). The file histories of applicant's applications reveal that the wording "professional baseball imprinted" was added to applicant's Class 25 identification of goods to mirror the "college imprinted" language in opposer's Class 25 application, and resulted in the examining attorney's withdrawal of a likelihood of confusion refusal citing opposer's pleaded registrations for the MINERS word mark in Classes 16, 25 and 41.

license does not use the term "imprinted." App. Exh. 2 (to Westemeier Dep.). Moreover, there is no evidence indicating when opposer hired CLC or whether, or to what extent, CLC was involved in opposer's agreement to amend the identification of goods in its Class 25 application in 1987.

Clearly, CLC was not involved in the Rolla License, which is between opposer and University of Missouri S&T directly, and bears the only other use of the "college imprinted" terminology in the record. Therefore, even if "professional baseball imprinted" means, to applicant, that the manufacturer of applicant's clothing must attach a hangtag with applicant's "main logo, their logo and then a tag line of official merchandise, part of the Southern Illinois Miners," with the "main logo" referring to applicant's composite mark, as Mr. Haag testified, there is no evidence that anyone else would interpret the term in that manner. Haag Dep., pp. 28-29. Without corroborating evidence, we cannot infer a parallel meaning to opposer's use of "college imprinted" in opposer's Class 25 registration.

Finally, although collegiate and professional team licensed products may have an attached sticker or hangtag on the merchandise, there is no evidence of record suggesting that consumers inspect the hangtag to verify whether the product is related to a collegiate or professional team. As Mr. Bouyack, one of opposer's expert witnesses and Vice President of Apparel Marketing at CLC opined: "In my experience, I know of no – no evidence to suggest that the consumers do consult the hangtag to determine the origin of the product." Bouyack Dep., p. 17.

Nor does the record support a finding that "college imprinted" clothing must bear a school name or be offered in traditional team colors, although both are

17

common for collegiate licensed merchandise. Mr. Bouyack testified that the phrase "college imprinted" means an item "with a college trademark imprinted and marked on the front of that product," and it does not mean that the name of the school must appear on the item, while Mr. Westemeier, Assistant Athletics Director for Trademarks and Licensing at the University of Texas, testified that he was not sure he knew what "college imprinted" means, but it "could be referencing the University of Texas at El Paso and its use of the word Miners." Bouyack Dep., pp. 19-20; Westemeier Dep., p. 95.

Mr. Bouyack also testified that both collegiate and professional team merchandise typically are sold with the college or professional team logo/nickname/trademark "on the front of the most visible portion of the product," and that the school nickname appears alone on collegiate merchandise approximately half the time. Bouyack Dep., pp. 10-12. The record contains several examples of both parties marketing clothing with the word MINERS emblazoned across the front with no additional indicia. These examples include baseball style jerseys from opposer, on the left, and applicant, on the right:

 

18

Opp. Exh. 2 (to Westemeier Dep.) and Opp. Exh. O (Responses to Requests for Admission No. 3), respectively.

Mr. Bouyack further testified that while apparel bearing college and professional team names and logos frequently display team colors, non-traditional color schemes that are unrelated to the college or professional team, such as pink or camouflage, are increasing in popularity. Bouyack Dep., pp. 12-14.

As noted above, our determination about the relatedness of the goods is based on the goods as they are identified in the applications and registrations. *Octocom,* 16 USPQ2d at 1787. The goods are limited to those which are "college imprinted" or "professional baseball imprinted." However, because the standard character marks are identical (MINERS), and because MINERS is used for both a college team and a professional baseball team, the goods identified in the applications and registrations may include identical shirts, hats and baby clothes imprinted with the word MINERS alone. Thus, different types of imprinting, i.e., college or professional baseball, could result in identical goods imprinted with identical marks. Even consumers subjected to such items side-by-side would not be able to tell which one was collegiate and which one was professional. Opp. Exh. Q (Casanover Discovery Dep., pp. 43-45, 48-49). In addition, due to the fallibility of memory and because prospective customers typically are not exposed to the marks side-by-side, if purchasers who encounter clothing imprinted with applicant's composite mark (featuring the word MINERS as the dominant element), at another point in time and place should encounter opposer's MINERS mark, it is unlikely such consumers

would know whether the respective imprints were collegiate or professional. *See Spoons Restaurants*, 23 USPQ at 1741 (TTAB 1991).

Because we find that the parties' Class 16 and Class 25 goods include highly similar items, and because on the record before us we cannot find that the prefatory language "college imprinted" and "professional baseball imprinted" distinguishes the Class 25 goods in a meaningful way, we resolve the second *du Pont* factor in favor of finding a likelihood of confusion.

   3.  Trade Channels

The third *du Pont* factor concerns the similarity or dissimilarity of established, likely-to-continue trade channels. As the identifications of goods in the applications contain no geographic or other restrictions as to trade channels or classes of customers, it is presumed that applicant's goods will be sold through normal channels of trade for such goods, including all usual retail outlets. *Octocom*, 16 USPQ2d at 1787; *Bison Corp. v. Perfecta Chemie B.V.*, 4 USPQ2d 1718 (TTAB 1987).

Because the Class 16 goods described in the applications and opposer's registrations are highly similar, we must presume that the channels of trade and classes of purchasers are the same. *See American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers."). *See also In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though

there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion). Even if we construed opposer's "media guides" to include "collegiate media guides" or "printed guides in the field of college sports for media use," there is nothing in the record indicating that they would not be distributed to the same media as applicant's "printed guides in the field of professional baseball for media use."

As to opposer's "college imprinted" apparel and applicant's "professional baseball imprinted" apparel in Class 25, the record evidence shows that the goods are of a type that are or could be sold in similar trade channels and directed to similar purchasers. Mr. Bouyack testified that other than the campus bookstore market, distribution channels for licensed collegiate and professional team products typically include grocery stores, drugstores, discount stores, wholesale clubs, malls, department stores, sporting goods stores, sports specialty shops, and over the Internet, and, therefore, such products could appear side-by-side within the same store. Bouyack Dep., pp. 9-10, 14, 39-40. Further, Mr. Westemeier testified that although opposer manages the way in which licensees are allowed to sell into certain retail distribution channels, opposer tries "to create a very broad base of retail opportunity for … alumni and fans to buy the product," and does not require licensees to obtain opposer's approval of specific retail accounts through which they sell opposer's licensed goods. Westemeier Dep., p. 25.

Applicant contends, however, that because it only sells its goods online and at its stadium, and its customer base consists of fans throughout the Frontier League

region, while UTEP's marketing and sales are primarily in the Conference USA region, and directed to UTEP students, alumni and fans, it is unlikely that the same consumer will encounter both opposer's and applicant's apparel and printed materials in the same trade channel.

Applicant's arguments are unconvincing in light of the unrestricted registrations and applications specifically at issue here. As discussed above, absent geographic or other restrictions regarding trade channels or classes of customers, our reviewing court's precedents require us to presume that applicant's clothing items travel in the same normal channels of trade for opposer's clothing items (e.g., national and local retail stores, discount stores such as Sam's Club, sports stores, and on-line retailers) and that applicant's and opposer's goods will be marketed to the same potential consumers. *See Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Octocom*, 16 USPQ2d at 1787; *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400 (TTAB 1998). *See also University of South Carolina v. University of Southern California*, 367 Fed. Appx. 129, 132 (Fed. Cir. 2010) (no likelihood of confusion between USC marks where Class 25 goods identified in opposer's registration were restricted to sale "at university-controlled outlets"; however, likelihood of confusion found where other classes of goods identified in opposer's registration were limited to "university authorized" channels, i.e., "any trade channels which are or could be authorized or approved by opposer university"). These presumptions are supported by the record, which shows that applicant has sold its Class 25 goods on the Internet through

facebook.com and eBay.com (in addition to its own website), and at the Illinois Center Mall. Opp. Exhs. KK and LL; Opp. Exhs. 28, 29, 31 and 32 (to Haag Dep.).

The overlapping trade channels through which the parties market their goods therefore weigh in favor of a finding of likely confusion.

4. <u>Conditions of Purchase</u>

The fourth *du Pont* factor examines the conditions under which, and to whom, sales are made. Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect.

As discussed above, the word MINERS appears on some of opposer's clothing with no other UTEP word or design marks. Similarly, the word MINERS appears on some of applicant's clothing with no additional wording or a design mark, and applicant's clothing is available through applicant's website, which is accessible nationwide.

We recognize that typical fans of collegiate athletics teams, such as students, faculty and alumni, likely will be familiar with a particular school's trademarks and often will look for and purchase merchandise believed to be related to the school. Fans of professional sports teams likely will exhibit a similar loyalty in making their purchasing decisions. However we cannot presume that these purchasers are the only purchasers of applicant's and opposer's goods. Rather, we find that purchasers of collegiate and professional sports teams' merchandise include relatives or friends of the fan who are purchasing the goods as gifts, new or casual fans nationwide who are likely to purchase a school's or professional team's athletic

merchandise when the team wins a national championship or otherwise becomes especially well-known on a national level, and those with no affinity to the school or professional team, who purchase the parties' Class 25 merchandise for other personal reasons, such as simply liking the way it looks. Westemeier Dep., pp. 25, 30, 106, 110-111; Bouyack Dep., pp. 18-19, 53-55.

Although some of the parties' more knowledgeable consumers may be more careful in their purchase, neither the registrations nor the applications contain limitations on the classes of customers. We therefore must not limit our consideration of this factor to the more sophisticated purchasers within the classes of potential customers. *See Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1027 (TTAB 2009), *citing Alfacell Corp. v. Anticancer, Inc.*, 71 USPQ2d 1301, 1306 (TTAB 2004). Moreover, as discussed above, the registrations and one of applicant's applications are for identical standard character marks (MINERS), with no limitations on the manner in which they appear. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 (Fed. Cir. 2012); *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010). And, as discussed above, the word MINERS is also the dominant element of applicant's composite mark. Thus, even a sophisticated purchaser could be confused. *See In re Research Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986), *citing Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers ... are not infallible.").

Thus, this factor also weighs in favor of a finding of likelihood of confusion as to the Class 25 goods. However, because the record is undeveloped as to the Class 16 goods, we find this factor neutral with respect thereto.

5. Fame of Opposer's Marks

The fifth *du Pont* factor requires us to consider evidence of the fame of opposer's mark. Fame, if it is found, must be accorded significant weight in our likelihood of confusion analysis. *See Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000). Because of the extreme deference accorded to a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting fame to clearly prove it. *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594, 1597 (TTAB 2009); *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

Opposer asserts that its MINERS marks have been in use since at least 1914, but the record does not differentiate which of opposer's registered marks have been in use since 1914 and for what goods or services. Opposer points to sales of approximately $24 million of goods bearing MINERS word and/or design marks from 2002 to 2008, while spending approximately $500,000 to $750,000 per year on advertising and promotion. Westemeier Dep. pp. 37-39, 107-108; App. Exh. 4 (to Westemeier Decl.); Opp. Exh. 4 (to Westemeier Dep.). As evidence of consumer recognition, opposer refers to national recognition of the performance of UTEP's student athletes, most significantly, the 1966 historic basketball championship of

the Texas Western Miners that was the subject of the movie "Glory Road," mentioned above, and to several articles from local and national publications spanning the 1960s, 1970s and 1980s, that publicized the MINERS marks in connection with UTEP sports. Opp. Exh. X.

We find that on this record, opposer has failed to meet its burden of proving fame. Opposer has not persuasively established the percentage of revenue or advertising figures which pertain specifically to the MINERS word and design marks, collectively or individually; instead, as Mr. Westemeier testified, the figures include all UTEP goods and all UTEP marks. Westemeier Dep., pp. 108-109. Even assuming opposer's sales figures and promotional efforts were limited to those covered by the pleaded MINERS word and design registrations, opposer's figures and media exposure are insufficient to prove fame. *See, e.g., Miss Universe L.P. v. Community Marketing Inc.*, 82 USPQ2d 1562, 1566 (TTAB 2007).[19]

As to media exposure, while opposer enjoyed some national coverage of MINERS athletics events, the most recent article that opposer submitted is dated 1988. We also note that the 1966 national basketball championship was indeed an historic event, and the subject of the 2006 movie "Glory Road." However, even if

---

[19] Applicant objected to Opposer's Exhibit 4 and the related testimony as more prejudicial than probative. However, as the foregoing discussion makes clear, the evidence does not support opposer's claim of fame, and, therefore, is not prejudicial to applicant. Accordingly, the objection is overruled. In addition, the Board generally does not strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, the Board considers such objections when evaluating the probative value of the testimony at final hearing. *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1755 (TTAB 2013), citing *Krause v. Krause Publications Inc.*, 76 USPQ2d 1904, 1907 (TTAB 2005) and *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1326 (TTAB 1992) (internal citations omitted). In accordance with our practice, we have not stricken the objected-to testimony.

UTEP achieved a modicum of fame following the release of "Glory Road," opposer's evidence of fame, taken as a whole, falls short of establishing the fame of opposer's MINERS word and design marks as contemplated by the fifth *du Pont* factor.

We conclude that this factor is neutral in this case.

6. Third-party Marks

Under the sixth *du Pont* factor, we consider evidence pertaining to the number and nature of similar marks in use on similar goods or services. "The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers have become educated to distinguish between different such marks on the bases of minute distinctions." *Palm Bay*, 73 USPQ2d at 1694. The probative value of third-party trademarks depends entirely on their usage; the evidence must show that the marks are well promoted and recognized by consumers. *Id.* at 1693.

While the record contains sufficient testimonial and documentary evidence to establish that many professional and amateur athletics teams, including college teams, share other names (see Bouyack Dep., pp. 14 and 46; Frank Dep., p. 65; Casanover Dep., pp. 20-23),[20] there is no probative evidence of registrations or widespread use of the single word MINERS, or a design mark containing an image of a miner, for Class 16 or Class 25 goods.[21] Moreover, it is unclear to what extent, if

---

[20] To the extent that colleges and professional teams share team names, there is no evidence that those teams concurrently own registrations for the same single-word standard character mark in Classes 16 or 25 without the registrant's consent, or a coexistence agreement between the parties. See Opp. Exhs. Y, Z and AA.

[21] There is no evidence of widespread use of the MINERS mark in Class 41. As noted above, opposer does not oppose registration of the services identified in Class 41. *See McDonald's Corp. v. McKinley*, 13 USPQ2d 1895, 1899-1900 (TTAB 1989).

any, the third-party "Miners" marks that applicant's expert, Mr. Casanover, identified are in use in the United States, and no evidence that they are extensively promoted or recognized by consumers. As opposer points out, two of the three athletics teams that Mr. Casanover emphasized during his direct testimony were not using "Miners" as their team name in the United States as of the date of his testimony. Opp. Exh. MM. The third, the "Mesa Miners," a professional baseball team, abandoned its Class 25 applications to register MESA MINERS and M MESA MINERS & Design after an examining attorney's refusal due to likelihood of confusion with opposer's pleaded MINERS word mark in Classes 16 and 41.[22] Opp. Exhs. BB and CC.

Finally, applicant raises several issues regarding the validity of the Rolla License. As noted above, the Rolla License was the result of prior Board litigation between opposer and the predecessor to Missouri S&T concerning the four MINERS registrations opposer pleads herein. Applicant argues that the Rolla License is a sham in that opposer is not enforcing or supervising the terms of the license, both parties are in breach because they are selling their goods in each other's territories, and no consideration was exchanged to permit both parties to use the MINERS mark. Applicant further contends that if opposer and Missouri S&T are not in breach, the Rolla License actually weakens opposer's marks because it allows the Missouri S&T Miners to exist in several states with no interference from opposer,

---

[22] In arguing that opposer's marks are weak, applicant also asserted that opposer failed to police its marks. App. Br., pp. 41-42. However, in light of the above discussion, it appears that there are few, if any, third-party "Miners" marks in use in the United States that could be the subject of opposer's policing efforts.

and without disclaiming an association with opposer. As applicant has not asserted a counterclaim of abandonment, we understand these attacks on the Rolla License to be directed to the strength of opposer's marks. Putting applicant's argument differently: instead of one university using "Miners" for its mascot, there are actually two independent users operating under the terms of what effectively is a coexistence agreement. If supported by the evidence, such a state of affairs would lead us to decrease the level of strength we would otherwise attribute to opposer's marks.

We have reviewed carefully the Rolla License and the pertinent sections of Mr. Westemeier's testimony (Westemeier Dep., pp. 46-51, 97-102) and related exhibits (Opp. Exhs. 6-7 and App. Exh. 4). We find that the evidence does not sufficiently support applicant's contentions to cause us to downgrade the strength of opposer's marks.[23]

In short, applicant's evidence of third-party uses of MINERS word or design marks is insufficient to support a finding, under the sixth *du Pont* factor, that opposer's MINERS word and design marks are entitled to a limited scope of protection. *See Chicago Bears Football Club, Inc. v. 12th Man/Tennessee* LLC, 83 USPQ2d 1073 (TTAB 2007) (rejecting applicant's argument that the Chicago Bears'

---

[23] While we harbor suspicions whether this sort of agreement between otherwise unrelated universities is indeed a trademark license that indicates to consumers one source and one quality standard, *see, e.g.*, *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 79 USPQ2d 1545, 1558 (9th Cir. 2006) (valid license "protect[s] the public's expectation that all products sold under a particular mark derive from a common source and are of like quality"), the evidence in this case is inconclusive on this factual point. We note that Mr. Westemeier testified on cross-examination that the Rolla License remains in effect, and that the use of the MINERS mark by Missouri S&T inures to the benefit of opposer. Westemeier Dep., pp. 100 and 102.

marks were entitled to only a limited scope of protection, given the large number of other "bear" registrations and applicant's assertion of 23 other "bears" college football teams). We therefore find that this factor is neutral.

### 7. Actual Confusion/Contemporaneous Use

Regarding the seventh and eight *du Pont* factors, applicant argues that there is no evidence of actual confusion, and, given Mr. Bouyack's position at CLC, his failure to identify actual confusion proves that there is no likelihood of confusion. Of course, applicant had only begun to offer services under its mark in 2007, two years before discovery closed, so there was little opportunity for confusion to have occurred. *See, e.g., Top Tobacco LP v. North Atlantic Operating Co.*, 101 USPQ2d 1163, 1174-5 (TTAB 2011) (absence of actual confusion may be probative where there has been a reasonable period of time and opportunity for confusion to have occurred); *accord Wella Corp. v. California Concept Corp.*, 558 F.2d 1019, 194 USPQ 419, 422-23 (CCPA 1977); *cf. G.H. Mumm & Cie v. Desnoes & Geddes, Ltd.*, 917 F.2d 1292, 1295, 16 USPQ2d 1635, 1638 (Fed. Cir.1990) (lack of actual confusion in over a decade was significant factor showing that confusion was unlikely). Accordingly, the seventh and eight *du Pont* factors are considered neutral.

### 8. Applicant's Prior Knowledge/Bad Faith

Opposer contends that applicant knowingly adopted its applied-for marks after receiving a trademark search report listing opposer's Class 41 MINERS mark as the sole "Group One" conflicting registration. This contention implies that applicant adopted its MINERS marks in bad faith. We disagree.

To show intent, opposer must establish that applicant had more than mere knowledge of opposer's prior mark. *Sweats Fashions Inc. v. Pannill Knitting Co. Inc.*, 833 F.2d 1560, 1565, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987) (even a search report showing opposer's mark is insufficient to establish intent). Here, the evidence shows that applicant selected MINERS as its team name because of the tradition of coal mining in and around Marion, Illinois, and as a tribute to that culture. Haag Dep., pp. 10-12 and 16. The factor of applicant's intent therefore is neutral.

<u>Summary</u>

We conclude that consumers familiar with opposer's MINERS word mark for "printed programs for college sporting events and media guides" and "college imprinted clothing, namely, shirts, hats and baby shirts" would be likely to believe, upon encountering applicant's MINERS word mark and SOUTHERN ILLINOIS MINERS and design composite mark for various printed materials including "printed guides in the field of professional baseball for media use" and "souvenir programs concerning professional baseball" and "professional baseball imprinted clothing" including "hats," various shirts and "infant and toddler one piece clothing," that the goods originate from or are somehow associated with or licensed by the same entity, notwithstanding the fact that opposer's goods primarily are collegiate-related, and applicant's goods primarily are related to professional baseball.

To the extent that any of the points argued by applicant raises a doubt about our finding of a likelihood of confusion, we resolve that doubt, as we must, in favor

of opposer as the prior user and registrant. *See Hewlett-Packard*, 62 USPQ2d at 1003 (Fed. Cir. 2002).[24]

<u>Counterclaim</u>

As defendant in this opposition, applicant automatically has standing to pursue its Section 18 petitions to partially restrict five of opposer's six pleaded registrations. *Finanz St. Honore B.V. v. Johnson & Johnson*, 85 USPQ2d 1478 (TTAB 2007) (applicant subject to opposition has inherent standing to counterclaim for cancellation); *Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492 (TTAB 2005) ("[a]pplicant, by virtue of its position as defendant in the opposition, has standing to seek cancellation of the pleaded registrations," citing *Ohio State University v. Ohio University*, 51 USPQ2d 1289, 1293 (TTAB 1999)).

A party seeking to avoid a likelihood of confusion by restricting the goods or services in an adverse party's pleaded registrations must prove that (1) the adverse party is not using its mark on the goods or services sought to be excluded by the proposed restriction, and (2) a finding of likelihood of confusion will be avoided by entry of the restriction of goods or services – that is, the restriction must be "commercially significant." *Eurostar v. "Euro-Star" Reitmoden GmbH & Co. KG,* 34 USPQ2d 1266, 1270 (TTAB 1994); *Aries Systems Corp. v. World Book Inc.,* 26 USPQ2d 1926, 1930 (TTAB 1993). "A restriction is 'commercially significant' if its entry would avoid a finding of likelihood of confusion or if the registrant has set forth its goods in terms that overstate the range of goods or the trade channels in

---

[24] In light of our disposition of the likelihood of confusion claim, we find it unnecessary to reach opposer's dilution claim.

which those goods move, so that fairness demands that an appropriate restriction to the registration be entered." *See Eurostar*, 34 USPQ2d at 1270 (citation omitted).

By its counterclaims, applicant seeks to restrict opposer's design mark registrations in Class 25 by adding the prefatory language "college imprinted" to Registration No. 2992329 (miner design) and "college imprinted clothing, namely," to Registration No. 3397296 (pickaxe design); adding the restrictive parenthetical "(excluding college baseball)" to the Class 41 services recited in Registration Nos. 1228753 (MINERS word mark) and 2992329 (miner design), and to the "printed programs for college sporting events" identified in the Class 16 identification of goods in opposer's Registration No. 1590813[25]; and adding the prefatory language "college imprinted" to the Class 28 "miniature basketballs" identified in Registration No. 1591100 (MINERS word mark).

We do not think that the restrictions sought here are commercially significant in light of the particular facts in this case. First, we found, above, a likelihood of confusion between Registration No. 1590965 (MINERS word mark) for "college imprinted clothing …" and applicant's MINERS word and SOUTHERN ILLINOIS MINERS and design composite marks with regard to the "professional baseball imprinted clothing …" identified in Class 25, and Registration No. 1590813 (MINERS word mark) for "printed programs for college sporting events and media guides" and applicant's applications with regard to various printed materials in

---

[25] We note applicant's statement: "While it is applicant's position that UTEPS's MINERS marks should be limited to both 'college imprinted' and lacking baseball, if UTEP's MINERS marks are limited to 'college imprinted' only, that by itself is sufficient for applicant to succeed on its counterclaim." App. Rebuttal Br., p. 3, fn. 4.

Class 16, including printed guides concerning professional baseball. In light of these findings, we did not need to decide whether a likelihood of confusion also exists between opposer's four other pleaded registrations and the applied-for marks which, along with opposer's Class 16 registration, are the subjects of applicant's counterclaims.

As discussed above, the proposed restrictions to opposer's registrations must be commercially significant, in that the restrictions must allow us to conclude that confusion would not be likely to result from use of the parties' marks on the goods identified in applicant's applications, and the goods identified in opposer's registrations, as restricted. *Cf., Embarcadero Technologies, Inc. v. RStudio, Inc.*, 105 USPQ2d 1825 (TTAB 2013) (successful use of Section 18 as an affirmative defense to a claim of likelihood of confusion in an opposition; amended applications allowed to proceed to registration). However, given our findings above, restricting opposer's registrations in Classes 28 and 41 in the manner applicant proposes would not be commercially significant – the restrictions would not obviate the likelihood of confusion with respect to use of the marks on the Class 16 and 25 goods identified in applicant's applications and the Class 16 and 25 goods identified in Registration Nos. 1590813 and 1590965, respectively. That is, restricting opposer's registrations in Classes 28 and 41 would do nothing to advance the applications to registration; opposer's registrations for the standard character MINERS marks in Classes 16 and 25 (Registration Nos. 1590813 and 1590965, respectively) would remain an impediment to the applications. Accordingly, applicant's Section 18 counterclaims to partially restrict Registration No. 1591100

(MINERS) in Class 28, Registration No. 1228753 (MINERS) in Class 41, and Registration No. 2992329 (miner design) in Class 41 are denied as futile.

Similarly, Registration No. 1590965 for the standard character MINERS mark in Class 25 would continue to block the advancement of applicant's applications in Class 25 regardless of whether we added the prefatory language "college imprinted" or "college imprinted clothing, namely" to the identifications of Class 25 goods in Registration Nos. 2992329 (miner design) and 3397296 (pickaxe design), respectively. Accordingly, applicant's Section 18 counterclaims to partially restrict Registration Nos. 2992329 and 3397296 in Class 25 also are denied as futile.

With respect to opposer's Registration No. 1590813 (MINERS word mark), applicant seeks to amend opposer's currently identified Class 16 goods from "printed programs for college sporting events and media guides" to "printed programs for college sporting events (excluding college baseball) and media guides."

A request to amend an identification of goods or recitation of services under Section 18 is, in essence, an equitable remedy. *See Milliken & Co. v. Image Industries Inc.*, 39 USPQ2d 1192, 1196 (TTAB 1995). As such, we must consider the registrant's use of the mark at the time the Section 18 restriction is requested, rather than when registrant obtained the registration. *Id.*, at 1995-96.

It is undisputed that UTEP does not have a baseball team, and has not fielded one for many years. The issue is whether restricting "printed programs for college sporting events and media guides" to "printed programs for college sporting events (excluding college baseball) and media guides" would allow applicant's Class 16 application to proceed to registration. Applicant's main and rebuttal briefs on the

counterclaim barely mention the Class 16 goods, and provide no argument or analysis as to why the proposed restriction to Registration No. 1590813 would be sufficient to avoid a likelihood of confusion with applicant's applications.

Accordingly, while a limitation on the type of goods could limit the channels of trade where "the registrant has set forth its goods in terms that overstate the range of goods or the trade channels in which those goods move, so that *fairness demands* that an appropriate restriction to the registration be entered." *See Eurostar*, 34 USPQ2d at 1270 (emphasis added), applicant has not persuaded us that this is an appropriate situation in which to order the proposed limitations in Class 16. It is undisputed that opposer sponsors several college sports teams, and we do not believe fairness demands, in such circumstances, that opposer's registration be restricted under section 18 to itemize certain, or all, of the sports for which it does not sponsor an intercollegiate team. Applicant therefore has not carried its burden, and applicant's Section 18 counterclaim to partially restrict opposer's Registration No. 1590813 is denied.

## Conclusion

Opposer's standard character MINERS mark is identical to applicant's standard character MINERS mark, and to the dominant portion of applicant's composite mark. The goods identified in the applications and registrations include legally identical media guides in Class 16, and various clothing including shirts, hats and baby clothes in Class 25 that differ only by the prefatory language "college imprinted" or "professional baseball imprinted." As the prefatory terms merely mean that a college or professional baseball mark will be imprinted on the Class 25

merchandise, and, in this case, the marks include the parties' identical standard character MINERS mark as well as applicant's composite mark, which features MINERS as the dominant element, the prefatory terms in the identifications do not necessarily result in affixation of marks that distinguish the goods.

The evidence also shows substantial overlap in the channels of trade (e.g., national and local retail stores, discount stores such as Sam's Club, sports stores, and on-line retailers) and classes of purchasers (e.g., relatives or friends of the sports fan, new or casual fans, and individuals who purchase the parties' merchandise simply because it is fashionable) for opposer's "college imprinted" apparel and applicant's "professional baseball imprinted" apparel. Consumers therefore could encounter, for example, opposer's baseball style shirt and applicant's baseball style shirt (depicted above), both imprinted with the identical MINERS mark, in the same retail outlets. Similarly, consumers could encounter shirts and other clothing imprinted with applicant's composite mark, which features MINERS as the dominant element, and clothing imprinted with opposer's MINERS mark, in the same retail outlets. We fail to see how consumers would differentiate the sources of the shirts in such a situation. Further, applicant has not rebutted the presumption that the parties' printed materials, which include legally identical items, move through the same trade channels and could be encountered by the same classes of consumers.

Finally, there is no evidence of significant or widespread use of the MINERS mark by third parties in relevant fields in the United States. Further, there is no evidence that college and professional teams that share team names concurrently

own registrations for the same single-word standard character mark in Classes 16 or 25 without the registrant's consent or a coexistence agreement between the parties.

Accordingly, we find that opposer has proved its Section 2(d) claim by a preponderance of the evidence. The counterclaim evidence and arguments are insufficient to warrant a different result.

**Decision:** Applicant's Section 18 counterclaims are denied. Opposition Nos. 91183196 and 91183698 are sustained and registration of applicant's marks is refused as to Classes 16 and 25.

Applicant's applications Serial Nos. 77034407 and 77043344 will proceed to registration in Class 41 only.